**Arnet Elisha HICKS, Plaintiff,**

v.

**E. I. DuPONT de NEMOURS AND COMPANY, Defendant.**

Civ. No. 6059.

United States District Court
N. D. Oklahoma.

Oct. 20, 1965.

B. W. Tabor, Rucker & Tabor, Tulsa, Okl., for plaintiff.

Jack N. Hays, Gable, Gotwals, Hays, Rubin & Fox, Tulsa, Okl., for defendant.

LANGLEY, District Judge.

This is an action for damages resulting from personal injuries sustained in an unexpected explosion of dynamite. The plaintiff attributes the explosion to a defective blasting cap, and claims both negligence of the defendant in manufacturing the cap and breach of an implied warranty of its fitness for use.

Arnet Elisha Hicks, the plaintiff, now a resident of Texas, worked with explosives on construction jobs for many years, and was experienced in the use of dynamite and blasting caps. On July 19, 1963, he was working on a project requiring the use of explosives in the Oologah Lake area, in the Northern District of Oklahoma, with a crew consisting of himself and two others. Neither of the others handled the explosives. His job was blasting holes along a rocky stretch for the placement of power line poles, using dynamite as the explosive and electric blasting caps as the detonator. The procedure Hicks followed was to drill a hole, slightly larger in circumference than a stick of dynamite, to a depth of some six or eight feet, using an air powered drill operated by one of the other members of the crew. He then placed several sticks of dynamite into the hole and affixed an electric blasting cap, which he discharged by connecting two lead wires to a battery. The rock loosened by the explosion was then cleaned out, creating the hole for the pole.

The detonator being used was the No. 6 Electric Blasting Cap manufactured by the defendant, E. I. DuPont de Nemours and Company, a Delaware corporation with its principal place of business in Delaware. The cap is an inch or so long and the approximate circumference of a pencil. Out of one end protrudes two small lead wires, eight feet in length. These are attached within the cap to bridge posts which are connected by a very thin filament wire which heats up when a sufficient electrical charge is sent through it, causing a chemical substance through which it passes inside the cap to ignite. This in turn causes another chemical combination in the cap to explode, which in its turn causes the explosion of still another more violently reacting substance. This final explosion detonates the dynamite charge to which the cap is attached.

In order to set off the explosion safely, it was Hicks' practice to cause the truck carrying the air compressor for the drill to be moved away from the "shot" to a distance of some 150 feet. Two "shooting wires" were then laid along the ground from the truck to the place the hole was to be made. After an explosive charge had been prepared, the lead wires from the blasting cap were attached to the two shooting wires. Hicks would then go to the other end of the shooting wires, pick them up off the ground and separate them, and after ascertaining that the danger area was clear, touch them to the two poles of a six volt battery on the truck, causing the explosion.

At the time with which we are concerned here an explosion had been set off by Hicks in this manner. After the explosion, he twisted the two shooting wires together at the truck, as a customary precaution to prevent stray contacts and any build-up of static electricity, put the wires on the ground, and went to the hole made by the explosion. Upon examining it, he discovered that a sloping, wedge shaped rock protruded out

into the hole some eight or ten inches below the surface of the ground, preventing clearing of the debris. He decided it would have to be blasted out. To do this, he made what is commonly called in the trade a "mud pack" charge. This was done by cutting open a stick of dynamite, spreading the powder in a thin layer on the protruding rock, placing a blasting cap on the dynamite, and covering the whole thing with a layer of dirt. In preparing the "mud pack", Hicks sat on the ground with his feet in the depression created by the previous explosion. When he had it ready, he attached the blasting cap lead wires to the ends of the shooting wires, got up and started away—and then was hit by the explosion and severely injured.

In preparing both the first and the second charge, Hicks followed his usual and customary practices and precautions. The only thing he did differently for the second was to make a "mud pack" type of charge instead of having a hole drilled for the dynamite.

To account for the premature or unexpected explosion, the plaintiff offered the testimony of an explosives expert who expressed the opinion that the blasting cap was defective in that at the time it was used it was supersensitive to an electrical charge, and therefore unsafe to use. He felt that random electric waves could have set it off, or that static electricity could have built up on the shooting wires sufficiently to explode the cap in its supersensitive condition, the latter being more likely. He was of the opinion that heat, overage, or erosion caused by moisture, could have caused the supersensitivity to develop after leaving the DuPont factory and that this was more probable than defective manufacturing. An additional witness was offered by the plaintiff as an expert in explosives who also expressed the opinion that the explosion resulted from a defective blasting cap, but gave no other basis for his opinion than the fact that the explosion occurred without the benefit of an electric current supplied by the battery. It is upon these opinions, and the testimony that the plaintiff used due care in handling the explosives, that the plaintiff bases his right of recovery from the defendant.

For the defendant, the manager of the plant at which the blasting cap in question was manufactured described in detail the manufacturing process and the numerous tests applied in making a cap. The testimony is not disputed, and is accepted by the court as establishing as a matter of fact that every care and precaution possible was used at the factory.

Another employee of the defendant, with 40 years experience in working with explosives manufactured by DuPont, including both dynamite and blasting caps, offered a theory as to the cause of the explosion that deserves consideration. He stated that it was his experience that no powder burns were received from an explosion if the person was as many as five or six feet away. Hicks received extensive powder burns, according to the testimony of his doctor, indicating he was much closer than that to the hole. Further, DuPont's explosives expert said, dynamite, when spread thin on a hard surface becomes sensitive and can be exploded by being hit by another hard object. When it is mixed with an abrasive material, such as the dirt in or near the area of the previous explosion probably used in making the "mud pack" it becomes extremely sensitive to shock. And when the hard surface upon which the dynamite is spread slopes, as was the case here, a glancing blow from a rock falling less than a foot could easily set it off. He was of the opinion that when Hicks stood up after preparing the "mud pack" he accidentally kicked one or more of the rocks that were probably lying about the hole after the previous explosion so that one or more of them hit the "mud pack", causing it to explode. His opinion as to sensitiveness of dynamite in these circumstances is not contradicted by any testimony or expert opinion offered by the plaintiff.

The plaintiff has offered no evidence as to the cause of the explosion except the

opinions of his experts, and their opinions as to the cause are based upon possibilities only. There was no evidence of neglect at the factory, and no evidence of deterioration of the cap after leaving the factory was introduced. In essence, the plaintiff's experts merely assume from the circumstances of the explosion that a defective blasting cap caused it and seek to explain how this could be so. They assume that the cap exploded first and then the dynamite, but do not exclude the possibility that it was the other way around, as suggested by the defendant. The defendant has done more than suggest, in fact. It has offered evidence, which is not disputed, that dynamite in the form of a "mud pack" charge, and particularly such a charge in the circumstances of this case, is highly sensitive to explosion by shock. While the opinion of its expert that the explosion was caused by a rock falling on the charge is in a measure speculative, there being no direct evidence to establish that fact, the existing conditions and circumstances certainly point to this as a possible cause.

The most that can be said for the plaintiff's case is that it presents evidence, in the form of the opinions of experts, of a possible cause of the explosion. But at best the possibility suggested is no greater than that offered by the defendant, and is based on no better or more substantial evidence. This, of course, is not enough to meet the plaintiff's burden of proof.

The court is of the opinion, therefore, and so finds, that the defendant was not negligent in the manufacture of the blasting cap involved in the explosion; that the plaintiff's evidence is insufficient upon which to base a finding that the blasting cap manufactured by the defendant was defective and unfit for the use intended; that the plaintiff's evidence is insufficient upon which to base a finding that the explosion originated with the cap rather than with the dynamite itself; and that the plaintiff has failed to meet his burden to establish a

right of recovery by a preponderance of the evidence.

Accordingly, judgment will be entered for the defendant and against the plaintiff.